Maurice B. VerStandig, Esq.
Bar No. MD18071
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: (301) 444-4600
Facsimile: (301) 444-4600
mac@mbvesq.com
*Counsel for Avant Diagnostics, Inc.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 23-243-ELG |
| | ) | (Chapter 11) |
| AVANT DIAGNOSTICS, INC. | ) | |
| | ) | |
| Debtor. | ) | |

**DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN
OF REORGANIZATION OF AVANT DIAGNOSTICS, INC.**

Comes now Avant Diagnostics, Inc.. ("Avant," the "Debtor," or the "Plan Proponent"), by and through undersigned counsel, pursuant to Section 1125 of Title 11 of the United States Code, and provides the following disclosure statement (the "Disclosure Statement") correlative to its plan of reorganization (the "Plan"):

THIS DISCLOSURE STATEMENT IS DESIGNED TO PROVIDE ADEQUATE INFORMATION TO ENABLE HOLDERS OF CLAIMS AGAINST THE DEBTOR TO MAKE AN INFORMED JUDGMENT ON WHETHER TO ACCEPT OR REJECT THE PLAN. ALL HOLDERS OF CLAIMS ARE HEREBY ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ANNEXED HERETO AS EXHIBIT "A" AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE COURT BEFORE OR CONCURRENTLY WITH THE FILING OF THIS DISCLOSURE STATEMENT. FURTHERMORE, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL CONTINUE TO BE MATERIALLY ACCURATE; AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

ALL HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT AS A WHOLE PRIOR TO VOTING ON THE PLAN. IN MAKING A DECISION TO ACCEPT OR REJECT THE PLAN, EACH CREDITOR MUST RELY ON ITS OWN EXAMINATION OF THE DEBTOR AS DESCRIBED IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.

NO PARTY IS AUTHORIZED BY THE SECURED CREDITOR TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS OR INFORMATION CONCERNING THE DEBTOR, ITS FUTURE BUSINESS OPERATIONS OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTOR. ANY INFORMATION OR REPRESENTATIONS GIVEN TO OBTAIN YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH ARE DIFFERENT FROM OR INCONSISTENT WITH THE INFORMATION OR REPRESENTATIONS CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY CREDITOR IN VOTING ON THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW. PERSONS OR ENTITIES HOLDING OR TRADING IN, OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, OR SECURITIES OF, THE DEBTOR, IF ANY, SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS SUCH COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED ACTIONS, THE DISCLOSURE STATEMENT AND PLAN AND THE INFORMATION CONTAINED THEREIN SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS GOVERNED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER RULE OR STATUTE OF SIMILAR IMPORT. THIS DISCLOSURE STATEMENT AND PLAN SHALL NEITHER BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE SECURED CREDITORS OR ANY OTHER PARTY NOR BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN. EACH CREDITOR SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN OR THE TRANSACTIONS CONTEMPLATED THEREBY.

This Disclosure Statement and the Plan annexed hereto as Exhibit "A" are being furnished by the Plan Proponent to holders of Claims pursuant to Section 1125 of the Bankruptcy Code, to permit creditors the opportunity to either accept or reject the Plan (and the transactions contemplated

thereby, as disclosed herein), as necessary. Capitalized terms in this Disclosure Statement, to the extent not otherwise defined herein, shall have the same definition that is assigned to capitalized terms in the Plan.

## I.    Introduction

The Debtor was the subject of an involuntary petition for relief, under Section 303 of Title 11 of the United States Code, on August 29, 2023 (the "Petition Date"). Avant elected to not contest the petition for relief and, instead, promptly filed an answer confessing insolvency.

In schedules subsequently docketed, Avant disclosed only (i) approximately $1,500,000.00 of stock in Theralink Technologies, Inc. ("Theralink"), subject to a restriction on alienation and thusly being of an unknown net present value; and (ii) *de minimis* cash on hand. This was juxtaposed with $474,798.67 in disclosed liabilities, albeit with two creditors having unliquidated and disputed claims of unknown sizes.

The bar date for non-governmental creditors to file claims herein is January 8, 2024. As of present, two claims have been filed that, if allowed, would invite an additional $47,598.84 in debt, over and above that provided for in the foregoing schedules. It is not known if any additional creditors will file claims on or before the bar date.

Though the Debtor was once a fully-operational business in the medical space, Avant's affairs – at all times since this case was commenced – have consisted primarily of holding the aforementioned stock, managing a single bank account, and navigating the reorganization process. The Debtor has no employees aside from its chief executive officer and does not presently carry on any consumer-facing business.

The Plan is one that calls for liquidation and dissolution of the Debtor. The Plan also calls for the payment, in full, of priority tax creditors of the Estate, payment of all allowed administrative expense claims of the Estate, and – assuming no large eleventh hour claims are docketed – payment, in full, of general unsecured creditors. The payment scheme, however, is delayed, so as to allow the Debtor to sell its stock in Theralink, on the open market, at a time (i) permitted pursuant to the existing lockup agreement; and (ii) coordinated so as to ensure the sale is not a predictable, singular market event capable of inviting manipulation by counterparties.

The Plan also contemplates a distribution, in cash, stock, or some combination thereof, to the Debtor's equity holders, following the retirement of all allowed claims and forward-looking business expenses. The Debtor will be ultimately wound up pursuant to the Plan and will cease to exist.

## II.    The Chapter 11 Confirmation Process

The Chapter 11 confirmation process is governed, in large part, by Title 11 of the United States Code (the "Bankruptcy Code"). Under the Bankruptcy Code, to be confirmed, the Plan must be accepted by at least one (1) class of creditors whose claims against the Debtor will be "impaired" under the Plan. Claimants who are scheduled to receive full payment on their claims without modification or changes to their right to payment are deemed to have accepted the Plan and do not vote. Only creditors whose claims are "impaired" or their right to payment terms is

modified or changed are entitled to vote in favor of accepting or rejecting the Plan. A class of claims is "impaired" if the amount to be paid to the class provides the claimants in that class with less than full payment of the allowed claims in that class or the terms for repayment are extended beyond the contractual due date or some other contractual terms are changed. Acceptance by such class requires that at least one-half of the creditors in the class who cast accepting votes on the Plan, and hold at least two-thirds of the total dollar amount of the claims in that class casting votes on the Plan. A class of claims that is likely to receive nothing under the Plan is not entitled to vote thereon and, to the contrary, is presumed to have rejected the Plan.

As indicated in the instructions accompanying the ballot (the "Ballot"), which is the form on which you may cast your vote to accept or reject the Plan, the Ballot must be delivered to the Plan Proponent's counsel in time to ensure that your Ballot will be received by the due date. Ballots received after the due date may not be counted.

Pursuant to Federal Rule of Bankruptcy Procedure 3017, a Ballot shall be mailed only to "creditors and equity security holders entitled to vote on the plan." The Plan consists of two classes of claims entitled to vote on the Plan, and thus those classes will receive ballots. All other classes of claims are presumed to have rejected the Plan.

### III.     Debtor's Background and Financial History

The Debtor was formed as a Nevada corporation on October 16, 2008. A diagnostic company that focused on the commercialization of a series of proprietary microarray-based diagnostic tests that provide early detection of cancers, neurodegenerative diseases, and other chronic and severe disease states. Avant was originally named Arrayit Diagnostics, Inc., which was formed as a majority owned subsidiary of Arrayit Corporation through a technology transfer in July 2009. In January 2013, the Debtor effected a name change to Avant Diagnostics, Inc.

For several years, the Debtor's stock was publicly traded under the ticker symbol AVDX. Following a sale of substantially all of the Debtor's assets to the entity ultimately known as Theralink, the Debtor ceased to be compliant with SEC filing rigors and, on or about May 10, 2019, had its securities registration revoked by the SEC. At all times since, the Debtor has existed chiefly to manage and vote stock received in the sale to Theralink.

A noteholder, to whom the Debtor has owed monies for several years, conveyed his claim to a limited liability company and then, acting on behalf of that limited liability company, caused this case to be involuntarily commenced. While the Debtor does not feign to speak for its petitioning creditor, it is reasonably believed the involuntary petition was timed to precede state court litigation in Texas, with a creditor reasonably believing the Debtor was better suited to enter the bankruptcy process than to incur substantial attorneys' fees contesting what the Debtor and its insiders regard to be nuisance litigation.

### IV.     Description and Valuation of Assets

While the Debtor has asserted the Theralink stock is worth $1,500,000.00, it bears notation that this valuation is wildly speculative. Though Theralink is publicly traded under the ticker symbol THER, Theralink has notified the SEC of the company's entry into a material definitive agreement whereby a merger will be effectuated with IMAC Holdings Inc. ("IMAC,"

4

Nasdaq: BACK). Theralink's disclosure of this contemplated merger is attached to the Plan as Exhibit 2. A copy of the Agreement and Plan of Merger is attached the Plan as Exhibit 3. It is reasonably expected this merger will close on or before December 31, 2024 (with it being expected to close far sooner but with this date being fixed in the interests of promoting conservatism).

Though Theralink presently has a market capitalization of approximately $4.42 million, it is reasonably believed that successful consummation of the aforementioned merger with IMAC may cause a substantial increase in the value of stock held by the Debtor (with such stock being in a merged entity). This is speculative, though; news of the merger is public and the value of Theralink stock may accordingly already reflect the anticipated synergy of the proposed merger. Equally, it is possible the proposed merger is sufficiently niche as to offer synergistic benefits not presently cognizable to the market writ large.

Parties in interest should *not* rely on any anticipated increase – or decrease – in the value of the Debtor's stock holdings, in considering the Plan. While the Debtor maintains cautious optimism that the proposed merger will be consummated and will invite an increase in the value of the Debtor's stock holdings, neither such eventuality has occurred as of the time of the filing of this Disclosure Statement and there are very real eventualities that could come to pass whereby one or both such eventualities may not occur.

The Debtor's cash assets are less than $20.00.

### V.      Summary of the Plan and Treatment of Claims and Interests

The Plan provides for the Debtor to sell stock, in a sum sufficient to retire all allowed claims, on or before December 31, 2025. Said sale will be undertaken in such tranches, and at such times, as the Debtor – in its absolute business judgment – may deem advisable, with attention paid to ensure stock is not sold at a predictable date and time that would permit market manipulation by any purchasers cognizant of the Plan. Within thirty (30) days of the conclusion of these sale activities, the Debtor will pay all allowed claims in full.

Following the payment of creditors' claims, the Plan calls for the Debtor to liquidate its remaining assets over a period of time not to exceed eighteen (18) months. This will be accomplished by the Debtor distributing all of its assets to the Debtor's respective equity interests, in cash, kind, or some combination thereof. For the avoidance of doubt, the Debtor anticipates a large portion of this distribution will be accomplished through the assignment of stock interests though the Debtor, in its absolute business judgment, may elect to first liquidate some or all of those stock holdings and, instead, disburse cash to the equity interests. Prior to undertaking any such distribution, however, the Debtor will first pay (i) all post-confirmation obligations of the Debtor (including taxes, payroll, brokerage fees, banking fees, and items of the like); and (ii) all taxes, fees, costs and obligations arising in connection with the disbursement of stock or cash to Equity Interests.

The Plan provides that upon the conclusion of the distribution to equity interests, the Debtor will be deemed to have dissolved and wound up without any further action required on the part of the Debtor, the equity interest(s) of the Debtor, or any other person.

The Plan provides for the following classifications of creditors' claims:

Class 1 – General Unsecured Creditors. Class 1 consists of all general unsecured claims, including the priority portion of the claim of Dr. Michael Ruxin. The claims subsumed in Class 1 are set forth in Exhibit A to the Plan. The total Class 1 claims total $478,798.67, of which $42,853.00 is disputed and will be subject to objection.

Class 2 – Equity Interest. Class 2 consists of the equity interests of the Debtor. This class has approximately 305 members. Inasmuch as this Plan proposes to pay creditors 100 cents on the dollar, each equity member shall retain her/his/its respective equity interest in the Debtor.

**Full Satisfaction and Release**. The payments, distributions and other treatment afforded to holders of allowed claims and interests under the Plan shall be in full and complete satisfaction, discharge and release of such allowed claims or interests against the Debtor.

## VI. Designation and Treatment of Unclassified Claims

**Administrative Expense Claims**. Two weeks after the date on which the Plan is confirmed (the "Effective Date"), or at such time as otherwise agreed, the holder of an allowed Administrative Claim against the Debtor shall receive, in full and final satisfaction of such Holder's allowed Claim, cash in an amount equal to the unpaid portion of such allowed Claim. Upon information and belief, there will be two Administrative Claims herein (i) that of the U.S. Trustee for quarterly fees; and (ii) that of the Debtor's counsel. The Debtor's counsel has agreed to be paid within eighteen (18) months of the Effective Date. Any fees due to the U.S. Trustee will be paid, in cash, on or before the Effective Date, through a capital contribution made to the Debtor by Dr. Michael Ruxin. It is not reasonably anticipated the U.S. Trustee fees will exceed $500.00 in the aggregate.

**Priority Tax Claims**. Unless a Final Order otherwise provides, on the Effective Date, each Holder of a Priority Tax Claim that is an allowed Claim against the Debtor shall receive, in full and final satisfaction of such Holder's allowed Claim cash in an amount equal to the unpaid portion of such allowed Claim. Notwithstanding the foregoing, the Holder of an allowed Priority Tax Claim shall not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the allowed Priority Tax Claim. The sole Priority Tax Claim is that of the Internal Revenue Service, which seeks $745.84 in interest and a penalty of $4,000.00. The interest shall be paid within 18 months of the Effective Date. The penalty is treated as a general unsecured claim.

## VII. Bar Date for Filing Claims

The bar date for filing a proof of claim in this case is January 8, 2024 for all creditors (except a governmental unit). The failure to file or deliver a proof of claim or a proof of interest by the applicable bar date constitutes a bar against the assertion, allowance or distribution on account of any such claim or interest.

**VIII.**     **Acceptance and Confirmation of Plan**

Except as discussed below, a prerequisite to the confirmation of the Plan is the acceptance of the Plan by each impaired class. A class is impaired unless, with respect to each claim or interest in such class, the Plan: (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default, (a) cures any such default that occurred before or after the Petition Date (other than "ipso facto" defaults as specified in Section 365(b)(2) of the Bankruptcy Code); (b) reinstates the maturity of such claim or interest as such maturity existed before such default; (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

In order to carry a designated class for purposes of confirmation of the Plan, the affirmative vote of holders of claims in each such class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims in that class who actually vote on the Plan, other than a holder who has been designated by the Court as in bad faith having accepted or rejected the Plan, or whose acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of Chapter 11 of the Bankruptcy Code is required. If the requisite acceptances from holders of allowed claims in each class of claims are obtained, and the Plan is confirmed, the Plan will be binding on all holders of claims and interests, including those who did not vote or who voted to reject the Plan (or those who are deemed to reject the Plan).

The Plan Proponent reserves the right to seek to confirm the Plan pursuant to the cramdown provisions of Section 1129(b) of the Bankruptcy Code. As a condition to confirmation, the Bankruptcy Code generally requires that each impaired class of claims or interest accepts a plan of reorganization. In the event that an impaired class does not accept the Plan, the Bankruptcy Court may nonetheless confirm the Plan if (i) the Plan satisfies all other requirements of Section 1129(a) of the Bankruptcy Code, and (ii) the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired class that has not accepted the Plan.

A plan of reorganization does not discriminate unfairly if (a) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are identical with those of the non-accepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Plan Proponent believes that the Plan satisfies these requirements with respect to each class.

The Bankruptcy Code establishes different tests for secured creditors, unsecured creditors and interest holders to determine if the Plan is "fair and equitable." The tests may be summarized as follows:

(a) Secured Creditors: either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value as of the Effective Date equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the

property securing the claim is sold free and clear of liens with such liens to attach to the proceeds, and the liens against such proceeds are treated in accordance with clause (i) or (ii), above.

(b) Unsecured Creditors: either (i) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed unsecured claim, or (ii) the holders of claims and equity interests that are junior to the claims of the non-accepting Class do not receive any property under the Plan on account of such claims and interests.

(c) Equity Interest Holders: either (i) each interest holder will receive or retain under the Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any of its interest or (b) the value of its interest, or (ii) the holders of interests that are junior to the non-accepting class will not receive any property under the Plan.

The Plan Proponent believes that the Plan is "fair and equitable" to interest holders, unsecured creditors, and secured creditors.

The Plan Proponent reserves all rights to modify or withdraw the Plan at any time prior to the Effective Date.

## IX.  Alternatives to Confirmation and Consummation of the Plan

The alternatives to the confirmation and consummation of the Plan include (1) the preparation and presentation of an alternative plan of reorganization and (2) the liquidation of the Debtor under chapter 7 of the Bankruptcy Code. The Plan Proponent believes that neither alternative provides any greater return to its creditors.

**Alternative Plans of Reorganization.** The Plan Proponent does not believe that an alternative plan would be viable or in the best interest of creditors or parties in interest. The Plan liquidates all assets of the Debtor and provides for the payment of claimants from the proceeds in accordance with the priority scheme established by the Bankruptcy Code. Accordingly, the Plan Proponent does not believe that rejection of the Plan in favor of a theoretical alternative would result in a greater distribution to any class of creditors or equity holders. The Plan Proponent firmly believes that the Plan is the best option for maximizing returns to creditors.

**Liquidation Under Chapter 7 of the Bankruptcy Code.** If no plan can be confirmed, it is the Plan Proponent's firm belief that liquidation under chapter 7 would result in lesser distribution than proposed by the Plan. Administrative claims would be increased as a result of the chapter 7 trustee fees and related administrative expense claims.

## X.  Implementation of the Plan

**Feasibility.** The Plan is strictly liquidating in nature and is thusly feasible.

**Sale of Stock.** As noted *supra*, the Plan proposes that the Debtor will sell its stock assets, on or before December 31, 2025, in a sum sufficient to pay all allowed claims in full. The Debtor will then, after payment of ordinary business expenses, distribute its remaining assets (in cash, kind, or some combination thereof) to its equity holders, in accord with their respective interests.

**Lack of Retention.** The Debtor shall retain no assets whatsoever.

**Dissolution.** Upon the Confirmation Order becoming a final order, the Debtor shall be deemed dissolved and wound up without any further action required on the part of the Debtor, the member(s) of the Debtor, or any other person.

### XI.    Distribution

**Delivery of Distributions.** Distributions and deliveries to holders of allowed claims shall be made at the addresses set forth on the proofs of claim filed by such holders (or at the last known addresses of such holders if no proof of claim is filed).

**No Interest Unless Otherwise Provided.** No interest shall be paid on any claim unless, and only to the extent permitted, under the terms of the Plan.

**Undistributed Property.** If any distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto, such unclaimed property shall be forfeited by such holder. Unclaimed property shall be donated to The Adler Foundation, a charity qualified pursuant to Section 501(c)(3) of Title 26 of the United States Code.

### XII.    Retention of Jurisdiction

Pursuant to Sections 1334 and 157 of Title 28 of the United States Code, the Bankruptcy Court shall retain jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan, for the purposes of Sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a)    to hear and determine any and all adversary proceedings, applications, or contested matters, including avoidance actions, and any remands from any appeals;

(b)    to hear and to determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan;

(c)    to enable the Estate Representative to prosecute any and all Causes of Action and to recover any transfers, assets, properties or damages to which it may be entitled under applicable provisions of the Plan, the Bankruptcy Code or any federal, state or local laws, including avoidance actions;

(d)    to consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(e)    to enter, enforce and implement such orders (including orders entered prior to the Confirmation Date) as may be necessary or appropriate to execute, interpret, implement, consummate or enforce the terms and conditions of the Plan and the transactions contemplated hereunder;

   (f)   to enter and to implement such orders (including orders entered prior to the Confirmation Date) as may be necessary or appropriate to execute, interpret, implement or enforce the terms and conditions of the Plan;

   (g)   to hear and to determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan; and

   (h)   to enter a final decree closing this Chapter 11 case.

**XIII.   Certain Tax Consequences**

The following discussion summarizes certain federal income tax consequences to the Debtor and Debtors' holders of claims and equity interests. This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions and published administrative rulings and pronouncements of the IRS, as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated hereafter could alter or modify the analysis and conclusions set forth below. Any such changes or interpretations may be retroactive and could affect significantly the federal income tax consequences discussed below. This summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special categories of taxpayers who are holders of claims (such as taxpayers who are not domestic corporations or citizens or residents of the United States, or are S corporations, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, broker-dealers and tax-exempt organizations) and assumes that each creditor holds its claim directly.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Plan Proponent has not requested and will not request a ruling from the IRS with respect to any of the tax aspects of the Plan.

**THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FOREIGN, FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN.**

**Certain Federal Income Tax Consequences to Debtor.** Upon information and belief, the Debtor is a pass-through entity for federal income tax purposes. Thus, the Debtor is not subject to taxes imposed under chapter 1 of the Tax Code. Accordingly, any net operating income or losses generated by the Debtor during a taxable year ("NOLs") will pass through to the equity interest.

Upon a sale of the Debtor' property any recognized gain or loss equal to the difference between the pre-distribution sale proceeds and Debtors' adjusted tax basis in the property that may be subject to capital gains tax will pass through to equity interest. The amount of gain recognized will include the full proceeds from any sale of property, including the amount of any indebtedness assumed by the buyer to which the property is subject. If the sale of the property results in a gain and such property was used in Debtors' trade or business, such gain would generally be treated as a "section 1231 gain." Such gain would be combined with other Tax Code § 1231 gains and losses. Generally, Tax Code § 1231 gains and losses are offset against each other on an annual basis, and net gain is treated as long-term capital gain, while net loss is treated as ordinary loss. Net § 1231 gains must, however, be treated as ordinary income to the extent of net § 1231 losses taken over the five most recent years, to the extent such losses have not been previously "recaptured."

**Certain Federal Income Tax Consequences to Creditors.** The federal income tax consequences of the Plan to a creditor will depend upon several factors, including but not limited to: (i) whether the creditor's claim (or portion thereof) constitutes a claim for principal or interest; (ii) whether the creditor is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above); and (iii) whether the creditor has taken a bad debt deduction with respect to its claim. In addition, if a claim is a "security" for tax purposes, different rules may apply.

**CREDITORS ARE STRONGLY ADVISED TO CONSULT WITH THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.**

A creditor receiving solely cash in exchange for its claim will generally recognize taxable gain or loss in an amount equal to the difference between the amount realized and its adjusted tax basis in the allowed claim. The amount realized will equal the amount of cash to the extent that such consideration is not allocable to any portion of the allowed claim representing accrued and unpaid interest, as further discussed below.

The character of any recognized gain or loss (i.e., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the creditor, the nature of the allowed claim in the creditor's hands, the purpose and circumstances of its acquisition, the creditor's holding period of the allowed claim, and the extent to which the creditor previously claimed a deduction for the worthlessness of all or a portion of the allowed claim. A loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of a loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered.

A portion of the consideration received by a creditor in satisfaction of an allowed claim may be allocated to the portion of such claim (if any) that represents accrued but unpaid interest. If any portion of the distribution were required to be allocated to accrued interest, such portion would be taxable to the creditor as interest income, except to the extent the creditor has previously reported such interest as income.

In the event that a creditor has not previously reported the interest income, only the balance of the distribution after the allocation of proceeds to accrued interest would be considered received by the creditor in respect of the principal amount of the allowed claim. Such an allocation would reduce the amount of the gain, or increase the amount of loss, realized by the creditor with respect to the allowed claim. If such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

**Federal Income Tax Consequences to Holders of Equity Interests Receiving Distributions.** Holders of allowed equity interests receiving distributions will generally recognize loss or gain in the amount of each such holder's adjusted tax basis in the equity interest. The character of any recognized loss or gain (i.e., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the equity interest in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period, and the extent to which the holder had previously claimed a deduction for the worthlessness of all or a portion of the equity interest.

A gain or loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered.

**Importance of Obtaining Professional Tax Assistance. No holder of a claim or equity interest should rely on the tax discussion in this Disclosure Statement in lieu of consulting with one's own tax professional. The foregoing is intended to be a summary only and not a substitute for consultation with a tax professional. The federal, state, local and foreign tax consequences of the Plan are complex and, in some respects, uncertain. Such consequences may also vary based upon the individual circumstances of each holder of a claim or equity interest. Accordingly, each holder of a claim or equity interest is strongly urged to consult with its own tax advisor regarding the federal, estate, local and foreign tax consequences of the Plan.**

XIV.     **Miscellaneous Provisions**

**Severability.** Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any claim or equity interest or transaction, the Plan Proponent may modify the Plan in accordance with the Plan, as applicable, so that such provision shall not be applicable to the holder of any claim or equity interest.

**Binding Effect.** Upon the entry of the Confirmation Order, all provisions of the Plan shall be binding upon, and shall inure to the benefit of, the Debtor, the holders of claims and equity interests, and such persons' respective successors and assigns.

**Governing Law.** Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, or a specific choice of law provision is provided, the laws of the District of Columbia shall govern the construction and implementation

of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without regard to conflicts of law.

**Timing of Distributions.** Any distribution required to be made hereunder on a day other than a business day shall be due and payable on the next succeeding business day.

**Revocation or Withdrawal of Plan.** The Plan Proponent reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order. If the Plan is withdrawn or revoked, then the result shall be the same as if the Confirmation Order had not been entered and the Effective Date had not occurred. If the Plan is revoked or withdrawn prior to the entry of the Confirmation Order, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor or any other person or to prejudice in any manner the rights of the such entity or any person in any further proceedings involving such entity.

**Nonmaterial Modifications.** The Plan Proponent may, with the approval of the Bankruptcy Court and without notice to holders of claims and equity interests, correct any nonmaterial defect, omission, or inconsistency herein in such manner and to such extent as may be necessary or desirable.

**Material Modifications.** Modifications of the Plan may be proposed in writing by the Plan Proponent at any time prior to confirmation, provided that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code, and the Plan Proponent shall have complied with Section 1125 of the Bankruptcy Code. The Plan may be modified at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under Section 1129 of the Bankruptcy Code, and the circumstances warrant such modification.

**Notices.** Any notice required or permitted to be provided hereunder shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) prepaid overnight delivery service and addressed as follows:

> Maurice B. VerStandig, Esq.
> THE VERSTANDIG LAW FIRM, LLC
> 1452 W. Horizon Ridge Pkwy, #665
> Henderson, NV 89012
> *Counsel for the Plan Proponent*

**Successors and Assigns.** The rights, benefits and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person.

### XV.    Confirmation Request

The Plan Proponent respectfully urges all parties entitled to vote on the Plan to do so in favor of the Plan, and respectfully pray this Honorable Court confirm the Plan.

                                                      Respectfully submitted,

Dated: January 2, 2024                      By: <u>/s/ Maurice B. VerStandig</u>
                                                    Maurice B. VerStandig, Esq.
                                                      Bar No. MD18071
                                                      The VerStandig Law Firm, LLC
                                                      1452 W. Horizon Ridge Pkwy, #665
                                                      Henderson, Nevada 89012
                                                      Phone: (301) 444-4600
                                                      mac@mbvesq.com
                                                      *Counsel for Avant Diagnostics, Inc.*